# EXHIBIT 1

# AGREEMENT OF SALE

---

between

## FINGERLAKES MALL, LLC

## AS SELLER,

## AND

## FINGERLAKES MALL ACQUISITION, LLC

## AS BUYER

Dated: August 18, 2006

## AGREEMENT OF SALE
### Fingerlakes Mall

This AGREEMENT OF SALE is made between Fingerlakes Mall, LLC, a Delaware limited liability company having offices at 124 Johnson Ferry Road NE, Atlanta, GA 30328 ("Seller"), and Fingerlakes Mall Acquisition, LLC, a Delaware limited liability company having an address at c/o Greenberg Nicoletta & Stein LLP, 370 Lexington Avenue, Suite 703, New York, New York 10017 ("Buyer"). The **"Date"** of this Agreement shall be the date which is one (1) business day after the Title Company receives four (4) original counterparts of this Contract signed by both Buyer and Seller. The Title Company shall insert such date on the following space of each counterpart of the Contract and shall send two counterparts to the Seller and two counterparts to the Buyer: August 1 8, 2006.

### BACKGROUND

The Background of this Agreement is as follows:

A.    Seller is the owner of a certain tract of land located in Aurelius, New York, respectively, together with the building and improvements thereon, including a shopping center containing approximately 427,750 square feet, commonly known as the Fingerlakes Mall, as more fully described on Exhibit "A" attached hereto; and

B.    Seller desires to sell to Buyer and Buyer desires to purchase from Seller the property referred to in this Agreement, upon the terms and conditions set forth herein.

### TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and with the preceding Background paragraphs incorporated by reference, the parties hereto, intending to be legally bound hereby, covenant and agree as follows:

1.    PROPERTY BEING SOLD.

Seller shall sell, transfer and convey to Buyer on the Closing Date (as hereinafter defined),

1.1    Real Property. (i) Fee simple interest in the land, as more fully described on Exhibit "A" with the buildings and improvements thereon, and (ii) all of the easements, licenses, rights of way, privileges, hereditaments, appurtenances, and rights to any land lying in the beds of any street, road or avenue, open or proposed, adjoining thereto, and inuring to the benefit of said property referred to in (i) and (ii) above (hereinafter collectively referred to as the **"Premises"** or the **"Land"**).

1.2     Personal Property. All equipment, fixtures, machinery and personalty of every description attached to or specifically used in connection with the Premises (and not owned by tenants under leases of the Premises), including without limitation, all contract rights, guaranties and warranties of any nature, all architects', engineers', surveyors' and other real estate professionals' plans, specifications, certifications, contracts, reports, data or other technical descriptions, reports or audits, all without warranty as to completeness or accuracy ("**Contract Documents**"), all governmental permits, licenses, certificates, and approvals in connection with the ownership and/or operation of the Premises ("**Licenses**"), all instruments, documents of title, general intangibles, and all of Seller's rights, claims, and causes of action if any, to the extent they are assignable, under any warranties and/or guarantees of manufacturers, contractors or installers, all rights against tenants and others relating to the Premises or the operation or maintenance thereof, including to the extent applicable, any warranties from any previous owners of the Premises (hereinafter collectively referred to as "**Personal Property**"); and

1.3     Leases. All leases, licenses and other occupancy agreements for any part of the Premises, and all prepaid rent and unapplied security deposits listed on Exhibit "B" (the "**Leases**").

The Premises, Leases and Personal Property are sometimes hereinafter referred to as "**Property.**"

2.     PURCHASE PRICE AND MANNER OF PAYMENT.

2.1     Purchase Price. Buyer shall pay the total sum of **Twenty Seven Million Dollars ($27,000,000)** (the "**Purchase Price**") subject to adjustment as set forth in this Agreement.

2.2     Manner of Payment. The Purchase Price shall be paid in the following manner:

2.2.1     Deposit. By delivery within one (1) business day from the date hereof of Buyer shall wire transfer to Escrow Agent (as hereinafter defined) the amount of **Two Hundred Thousand ($200,000) Dollars (the "Initial Deposit")** to:

Lawyers Title Insurance Company
c/o Boyle & Anderson, P.C.
110 Genesee Street, Suite 300
Auburn, New York 13021

being the "Title Company" as that term is hereinafter defined, (also hereinafter referred to as "**Escrow Agent**" or "**Escrowee**"). On or before September 15, 2006, Buyer shall wire transfer to Escrow Agent an additional **Two Hundred Thousand ($200,000) Dollars** (the "Second Deposit") and on or before October 15, 2006, Buyer shall wire transfer to Escrow Agent an additional **Two Hundred Thousand ($200,000) Dollars** (the "Third Deposit"). The Initial Deposit, Second Deposit and Third Deposit, to the extent then paid, shall be referred to herein as the "**Deposit**", and shall be held by Escrow Agent in a federally-insured, segregated money market account at an institution to be designated by Buyer until termination or consummation of this Agreement. Interest on the Deposit

shall be credited to Buyer at Closing, or paid to the party otherwise entitled to the Deposit in the event of the termination of this Agreement prior to Closing. Except as specifically provided herein, the Deposit shall not be refundable to Buyer.

2.2.2 <u>Cash Balance</u>. The balance at the Closing of Title by delivery to the Seller, by bank cashiers, title company, or certified check, or by wire transfer, subject to adjustment as herein provided.

2.2.3 <u>Failure to Pay Deposit</u>. Should Buyer fail to make payment required by Paragraph 2.2.1 above, in such instance Buyer shall have defaulted under this Agreement entitling Seller to termination of this Agreement.

2.2.4 <u>Payment of Deposit Monies by Check</u>. If the payment made on account of the Purchase Price at the time of the execution of this Agreement is by check and if said check fails due collection, the Seller, at its option, may declare this Contract null and void and of no force and effect.

3.    <u>TITLE</u>. On the Closing Date, Seller shall convey to Buyer good and marketable fee simple title to the Property free of all rights of way, easements, covenants, restrictions, mortgage liens, mechanics liens, any other monetary liens, subordination non-disturbance agreements or any other exception to title which may effect its current use and occupancy, which title shall be insurable at regular rates by Lawyers Title Insurance Corporation (the "Title Company"), under the ALTA form title insurance policy required by Buyer's lender, and by the most recent form utilized by the Title Company for owner's policies, and otherwise in form reasonably satisfactory to the Buyer's counsel ("Title Policy").

3.1    <u>Title Binder</u>. Prior to or accompanying Seller's execution of this Agreement, Seller shall deliver to Buyer, Seller's title policy for the Property (complete with copies of all exceptions to title), and Seller will thereafter promptly order a current title commitment (the "<u>Title Binder</u>" or the **"Title Commitment"**) from the Title Company to deliver to Buyer at Closing an ALTA Form Owner's Title Policy for the Property with full extended coverage over all general exceptions (the **"Title Policy"**), describing the Property (which legal description shall be deemed incorporated into this Agreement), listing Buyer as the prospective named insured, and showing the Purchase Price and any permissible closing costs incurred by Buyer as the amount of insurance coverage. The Title Policy shall include such other endorsements as Buyer's lender may require, and as may be obtained under the laws of the State of New York. The costs of the Title Policy, and all endorsements to the Title Policy shall be paid by the Buyer. At such time as the Title Commitment is furnished to Buyer, Buyer shall furnish a copy thereof to Seller, including legible copies of all instruments referred to in the Title Commitment as conditions or exceptions to title to the Property (the **"Exception Documents"**).

Buyer shall have until ten (10) days after the receipt of the Title Commitment together with copies of all the exceptions to title and ten days after receipt of an updated survey in which to notify Seller of any objections Buyer has to any matters shown or referred to in the Title Commitment or on the Survey (as hereinafter defined). All encumbrances or exceptions which are set forth in the Title Commitment or the Survey to which Buyer does not object shall be deemed to

be permitted exceptions (the **"Permitted Exceptions"**) and Buyer agrees to take title subject thereto. Seller shall within ten (10) days of receipt of such notice advise Buyer as to whether Seller will cause any matters objected to by Buyer to be removed of record prior to Closing. If Seller fails to so advise Buyer, or advises Buyer that it will not remove of record such exception or encumbrance, Buyer may upon written notice to Seller terminate this Agreement, the Deposit and, if applicable, Additional Deposit, shall be refunded to Buyer and, thereafter, the parties shall have no further liability to one another hereunder. In the alternative, Buyer may elect to purchase the Property subject to such matters, without any offsets against the Purchase Price. In the event Seller agrees to remove any objected to exception of record, Seller shall have until October 15 to effect such removal; provided that in lieu thereof, Seller may arrange for the Title Company to provide Buyer with affirmative title coverage as to such objected to matter(s), at no additional cost to Buyer.

Notwithstanding anything herein to the contrary, Seller promises and represents that it will pay and cause to be released, no later than the closing, all liens against the Property. Seller may utilize the purchase price proceeds to cause the payment and release of such liens no later than the closing, provided that such proceeds shall be sufficient to cure all title objections. Permitted Exceptions shall not include any encumbrances or exception appearing of record for the first time subsequent to the date of Buyer's notice to Seller pursuant to this Paragraph 3.1. If any such item appears of record subsequent to Buyer's notice, Buyer shall give Seller written notice of same within five (5) days of receipt of knowledge of such exception or encumbrance. Seller shall within ten (10) days of receipt of such notice advise Buyer as to whether Seller will cause same to be removed of record prior to Closing. If Seller fails to so advise Buyer or advises Buyer that it will not remove of record such exception or encumbrance, Buyer may upon written notice to Seller terminate this Agreement, the Deposit and, if applicable, Additional Deposit, shall be refunded to Buyer and, thereafter, the parties shall have no further liability to one another hereunder.

3.2    Survey. Prior to or accompanying Seller's execution of this Agreement, Seller shall deliver to Buyer any existing survey of Property in Seller's possession, and Buyer may order an updated ALTA survey (the "Survey"), prepared by a duly licensed land surveyor acceptable to Buyer.

4.    COVENANTS. In addition to the covenants contained in the other Sections of this Agreement, Seller covenants that it shall:

4.1    Maintenance. At all times prior to the Closing Date, maintain the Property in good condition and repair, reasonable wear and tear alone excepted, operate the Property using the same management practices and leasing standards as solely determined by Seller, and pay in the normal course of business prior to Closing, all sums due for work, materials or service furnished or otherwise incurred in the ownership and operation prior to Closing. Seller shall afford access to the Property to Buyer and Buyer's representatives, at reasonable times after notice. No fixtures, equipment or personal property included in this sale shall be removed from the Property unless the same are replaced prior to the Closing with similar items of at least equal quality, free from all liens, claims and encumbrances.

4.2    Alterations. Not make or permit to be made any alterations, improvements or additions to the Property without the prior written consent of Buyer, except those (i) made by Seller

if required by applicable law or ordinance, (ii) as required or permitted under any Lease, (iii) required by casualty loss or emergency, or (iv) made by tenants pursuant to their rights under existing or new leases.

        4.3     Leases. Prior to Closing, Seller shall use commercially reasonable efforts to enter into new leases at the Property providing a minimum of $85,000 per year in minimum rents ("Seller's Additional Income Obligation") separate and apart from the rents shown on the rent roll attached hereto as Exhibit "B" (not including rent shown thereon for the Communicate Wireless space). Buyer specifically acknowledges that Seller is currently working to replace the tenant known as Communicate Wireless with a new tenant and to lease premises at the Property to Seafood Express and Wendy's, however, Seller shall have the right to substitute tenants or lease other premises at the Property in satisfaction of Seller's Additional Income Obligation, provided that all leases proposed in satisfaction of Seller's Additional Income Obligation shall have minimum five (5) year initial terms and shall be subject to the approval of Buyer, which shall not be unreasonably withheld or delayed. All costs associated with the leases entered into (or presented to Buyer for execution after Closing, as set forth below) shall be paid by Seller including landlord work costs, tenant allowance and leasing commissions.    In the event Seller has not fully satisfied Seller's Additional Income Obligation as of Closing, a part of the Purchase Price equal to: (i) the shortfall in income below the additional $85,000 multiplied by five (x 5) and (ii) any costs not yet paid or payable associated with the executed leases which partially satisfy the Seller's Additional Income Obligation, shall be placed in Escrow with Escrow Agent (the "Seller's Additional Income Obligation Escrow"). Any negative changes in the existing rent (excluding the three tenants noted above) shall not increase Seller's Additional Income Obligation, provided that Seller shall not voluntarily terminate or amend any lease without the consent of Buyer. Seller shall have the opportunity to satisfy the unsatisfied part of Seller's Additional Income Obligation following Closing, but only up to and including December 31, 2006. In the event Seller completes any such leasing after Closing, the amount in the Seller's Additional Income Obligation Escrow attributable to the income represented by such new leasing LESS any costs attributable to such new leasing shall be disbursed to Seller upon the applicable tenant's commencement of rent payments under its lease. After Closing, Escrow Agent shall disburse to Buyer, where appropriate, or a designated third party (the tenant, contractor, leasing agent or other involved party) parts of the Seller's Additional Income Obligation Escrow as needed to pay costs associated with such leases, as the request of Buyer and Seller, provided that either Buyer or Seller may request disbursement of such amounts with notice to the other party, but Escrow Agent shall not disburse such amount until five (5) business days shall have elapsed from receipt of such request without objection from the other party. If an objection is received, it shall enunciate the reasons therefor and Escrow Agent shall not disburse any such funds until an agreement is reached between the parties. Following Closing, Buyer and its management agent shall cooperate with Seller and its leasing efforts with regard to Seller's Additional Income Obligation. Any part of the Seller's Additional Income Obligation Escrow not disbursed by January 1, 2007, unless otherwise then agreed in writing, shall be distributed to Buyer and Buyer shall thereupon assume responsibility for payment of any outstanding leasing related costs. All costs associated with any new leasing done prior to Closing, not credited against Seller's Additional Income Obligation, and approved by Buyer shall be borne solely by Buyer and, if required to be paid prior to Closing, shall be reimbursed to Seller at Closing.

4.4    Security Deposits. Not apply any tenant's security deposit to the discharge of such tenant's obligations, unless the tenant is no longer in possession of the Premises.

4.5    Bill Tenants; Percentage Rents. (a) Timely bill all Tenants for all rent billable under Leases, and use commercially reasonable efforts to collect any rent in arrears. (b) Immediately provide Buyer with a copy of any sales or other information received by Seller which is in any way related to the calculation of percentage rent or other variable rent owing under any Leases.

4.6    Notice to Buyer. Immediately notify Buyer of the occurrence of any of the following: (i) a fire or other casualty causing damage to the Property, or any portion thereof; (ii) receipt of any notice pertaining to the possibility of eminent domain proceedings or condemnation of or affecting the Property, or any portion thereof; (iii) receipt by Seller of any notice pertaining to any governmental authority or insurance underwriter relating to the condition, use or occupancy of the Property, or any portion thereof, or any real property adjacent to any of the Property, or setting forth any requirements with respect thereto; (iv) receipt or delivery of any default or termination notice or claim of offset or defense to the payment of rent from any tenant; (v) receipt of any notice of default from the holder of any lien or security interest in or encumbering the Property, or any portion thereof; (vi) a change in the occupancy of the leased portions of the Property; (vii) notice of any actual or threatened litigation against Seller or affecting or relating to the Property, or any portion thereof; or (ix) the commencement of any strike, lock-out, boycott or other labor trouble affecting the Property, or any portion thereof.

4.7    No New Agreements; Maintain Current Agreements. Except as otherwise set forth herein or for agreements which can be terminated on not more than thirty (30) days' notice, not enter into any other agreements which affect or encumber the Property or the transactions contemplated by this Agreement, without the prior written consent of Buyer; and not permit the creation of any liability which shall bind Buyer or the Property after Closing. Seller until the Closing shall maintain in full force and effect all insurance presently maintained with respect to the Property.

4.8    NYDOT Permit. Seller is in the process of negotiating plans and documentation with the New York Department of Transportation ("NYDOT") regarding the creation of a deceleration lane at the eastern entrance to the Property, and certain changes to the Clark Street Extension (together, the "NYDOT Work") being performed in the area shown on Exhibit "F". Seller agrees to be responsible for any and all costs of the NYDOT Work. At the Closing, Seller shall escrow for the benefit of Buyer at Closing: (a) the amounts remaining due under any guaranteed maximum or fixed price contracts for performance of the work; and (b) 125% of the agreed upon estimated costs to perform any aspect of the NYDOT Work which is not then covered by a binding guaranteed maximum or fixed price contract. In support of subpart (a) above, Seller shall deliver to Buyer a written statement from its contractor verifying the amounts remaining due under its contract and verifying that the work covered by such contract represents the full scope of work required by the agreements with NYDOT. Notwithstanding such escrow, Seller shall remain responsible for payment of any Seller approved change orders or unanticipated costs associated with the NYDOT Work. Buyer agrees not to knowingly take any action which increases such costs.

4A.    COVENANTS OF BUYER. In addition to the covenants contained in the other Sections of this Agreement, Buyer covenants that it shall:

4A.1.  Property Information; Confidentiality.  In the event this Agreement is terminated by either party prior to Closing, Buyer agrees to promptly return to Seller all information regarding the Property provided to Buyer by Seller, its management agent or Broker.  Buyer further agrees that during its review of the Property and following any termination of this Agreement, Buyer shall keep information about the Property confidential and will share it only with its members, partners, investors, consultants, lender and counsel as necessary to effect the transaction.  This confidentiality agreement shall apply to all information supplied to Buyer by Seller, its Broker or management agent, and shall not apply to information gathered by the Buyer from public sources.

4A.2  CCIDA Assumption.  Buyer acknowledges that as part of its purchase of the Property, the consent of the CCIDA is required.  Seller and its counsel will prepare, at Seller's cost, all documentation regarding such consent, but Buyer covenants to use reasonable efforts to cooperate with such efforts, including but not limited to providing such information regarding Buyer as may be requested by the CCIDA in conjunction with its review and approval of the sale and assumption.  The consent of CCIDA to the assumption of its agreements by Buyer is a condition precedent to Buyer's obligation to purchase the Property pursuant to this Agreement.  Failure to procure the approval of CCIDA to such assumption (without any limitation to Buyer's rights to the benefits provided by the CCIDA agreements) shall entitle Buyer to terminate this Agreement and receive a full refund of any and all Deposit paid.

4A.3.  NYDOT Permit.  Seller has provided Buyer with all currently available information regarding the road work required at the Property by NYDOT prior to the opening of the adjoining hotel site (both the general area of the NYDOT Work and the hotel site being shown on Exhibit "F").  Seller has agreed to be responsible for the costs of the NYDOT Work, and to escrow for the benefit of Buyer at Closing the estimated costs to complete any unfinished elements of the NYDOT Work. Notwithstanding such agreements of Seller, upon its acquisition of the Property, Buyer will be required to apply to NYDOT for its approval of Buyer as a new "permittee" (as such term is used in the NYDOT documents), and Buyer covenants and agrees to provide such information as may be necessary to install Buyer as a substitute permittee so that the NYDOT Work can continue to timely completion.

5.  REPRESENTATIONS BY SELLER.  In order to induce Buyer to enter into this Agreement, except as those matters in this paragraph which are limited to Seller's best information or best belief, each Seller hereby covenants, represents, and undertakes to Buyer that the following representations are true now, will be true at Closing and shall survive Closing for a period of six months:

5.1  Seller's Authority For Binding Agreement; Ownership.  Seller is a duly authorized and validly existing limited liability company, formed under the laws of Delaware, and authorized to do business in New York.  Seller has full power, right and authority to own its properties, to carry on its business as now conducted, and to enter into and fulfill its obligations under this Agreement. The person executing this Agreement on behalf of Seller is authorized to do so. This Agreement is the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms. The execution and delivery of this Agreement and compliance with its

terms will not conflict with or result in the breach of any law, judgment, order, writ, injunction, decree, rule or regulation, or conflict with or result in the breach of any other agreement, document or instrument to which Seller is a party or by which it or the Property is bound or affected. Seller is the sole owner of the Property, and has full power, authority and right to execute, deliver and perform this Agreement. All fixtures and articles of personal property included in this sale are owned by Seller, free from all liens, claims and encumbrances.

5.2    On Site Employees.    All persons and entities presently employed in connection with the operation and maintenance of the Property are employees of Jones Lang LaSalle Americas, Inc. ("JLL") or its affiliates and are not employees of Seller. Seller's management agreement with JLL shall be terminated by Seller as of Closing. There are no labor disputes pending, nor to the best of Seller's knowledge, contemplated pertaining to the operation or maintenance of the Property, or any part thereof. Seller has no employment agreements, either written or oral, with any person which would require Buyer to employ any person after the date hereof.

5.3    Service Contracts. Exhibit "C" attached hereto is a list of all existing service, equipment, supply and maintenance contracts with respect to or affecting the Property (the "Service Contracts").

5.4    Condemnation. There is no condemnation or eminent domain proceeding or pending with regard to any part of the Property, and to the best of Seller's knowledge, no such proceedings are proposed, however, in consideration of the changes to the eastern entry to the Property, necessitated by the development of the hotel parcel adjacent to the northeast portion of the Property, Seller has entered into or anticipates entering into certain agreements with NYDOT which may at some future date limit or restrict the ingress to and egress from the Property through the western curb cut (as generally shown on Exhibit "F"). Seller shall not enter into any future agreements with NYDOT without the prior written consent of Buyer, provided that Seller may execute and deliver an agreement substantially in the form attached as Exhibit "F-1" attached hereto. Copies of the plans and documents related to this NYDOT work have been delivered by Seller to Buyer. Seller represents that it has contracted for all improvements required by NYDOT on the eastern side of the Property and that in the event such improvements are not completed prior to Closing, Seller shall retain responsibility for completion of same at Seller's cost.

5.5    No Lawsuits. There are no claims, lawsuits or proceedings pending, or to the best of the Seller's knowledge, threatened against or relating to the Property or which could affect them, or either of them, in any court or before any governmental agency, except for actions as disclosed in Exhibit "D".

5.6    No Tax Assessments. There are no public improvements in the nature of off-site improvements, or otherwise, which have been ordered to be made and/or which have not heretofore been assessed, and, to Seller's knowledge, there are no special or general assessments currently affecting or pending against the Property. There are no tax abatements or exemptions presently affecting the Property other than the agreements in place with the CCIDA.

5.7    Leases. Except as set forth on all pages of Exhibit "B", which set forth a true, complete and correct certified rent roll, a list of security deposits and a Schedule of Leases for the

Property, there are no oral or written leases or rights of occupancy or grants or claims of right, title or interest in any portion of the Property (the "Leases") except for those licensees listed on Exhibit B-1. Seller represents and warrants that the copies of the Leases heretofore delivered to Buyer's attorney are true and complete copies of the original Leases; all Leases are valid and in full force and effect; the rents set forth on the Schedule of Leases are being collected on a current basis except as reflected by the delinquency report attached hereto as Exhibit B-2 and there are no arrears in rent in excess of one month, except as may be set forth on said Exhibit B-2. Seller has not sent any notice to any tenant claiming that the tenant is in default, which default remains uncured, except as may be set forth on Exhibit B-2; no action or proceeding pertaining to the Leases is pending in any court, no tenant has a right of first refusal, option or purchase or right of first offer as it relates to the Property; Seller has no knowledge that it is in default of its obligations under any Lease; and except as shown on Exhibit B-2, no tenant is in default under its Lease.

        5.8    Compliance with Law. Except as provided for in Exhibit "E" and upon Seller's best information and belief:

        (i) Seller has received no written notice from a governmental authority having jurisdiction over the Property that remains uncured alleging that the Property is in violation of applicable laws, rules or regulations. Seller has no knowledge of any incinerator, boiler or other burning equipment on the Property being operated in violation of any applicable law. All notes and notices of violations of law, ordinances, orders or requirements issued prior to the date of this Agreement by any governmental authority having jurisdiction over the Property for which Seller is responsible to abate pursuant to the Leases shall be cured and removed by Seller. Seller shall furnish Buyer upon request written authorization to make searches for violations and liens.

        (ii)    There is no pending claim, lawsuit, proceeding, or other legal, quasi-legal, or administrative challenge concerning the Property or the operation thereof or any condition thereon, and no such claim, lawsuit, proceeding or challenge is threatened by any person or entity.

        (iii)    No governmental authority has served upon Seller any notice claiming any violation of any statute, ordinance or regulation or noting any need for repair, construction, alteration or installation with respect to the Property or requiring any change in the means or methods of those conducting operation thereon except for NYDOT as noted above.

        5.9    No Brokers. No brokerage or leasing commission or other compensation is now, or will at Closing be, due or payable to any person, firm, corporation, or other entity with respect to or on account of any of the leases, or any extensions or renewals thereof except for commissions due to JLL or The Cameron Group which shall be paid by Seller unless otherwise agreed in writing as to any new lease.

        5.10    FIRPTA. Seller is not a "foreign person" as defined in Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). If Seller fails or refuses to deliver to Buyer at the Closing a certificate evidencing that Seller is not a "foreign person", or if Seller is a "foreign person", then Buyer shall be entitled to withhold from the Purchase Price a tax equal to ten percent of the Purchase Price, as required by Section 1445 of the Code. In the event of such a withholding, Buyer shall remit such tax to the Internal Revenue Service and shall file the required

return, and the Closing hereunder shall not be otherwise affected. Seller hereby waives any action or claim against Buyer pertaining to any such withholding, and agrees to look solely to the Internal Revenue Service for any refund of such tax.

5.11    Right of First Refusal.    No person, firm, or entity, including, for example, a tenant in the Property, has any option or other right to purchase or acquire all, or any part, of the Property, including, without limitation, a right of first refusal with respect thereto.

5.12    Contiguous Property. Neither Seller, nor any principal or other member of Seller, has an equity or mortgage interest in any parcel of property which is contiguous to the Property. By executing this Agreement, Seller is agreeing to sell its entire interest in the Property to Buyer. Seller does own a noncontiguous parcel of land shown as the "Drainage Parcel" on Exhibit "F" attached hereto and intends to deed said property to the owners of the All Storage property also shown on said Exhibit "F" prior to Closing.

5.13    Waiver of Rights by Buyer. Notwithstanding anything hereinabove to the contrary, the Buyer shall have the right to waive any contingencies herein which inure to the benefit of Buyer and close title hereunder in accordance with the other terms and provisions of this Agreement.

5.14    Construction Liens.  All persons supplying construction labor or materials to the Premises on behalf of Seller have been paid or shall be paid prior to Closing.

5A.    REPRESENTATIONS OF BUYER.  Buyer makes the following representations and warranties and agrees that Seller's obligations under this Agreement are conditioned upon the truth and accuracy of such representations and warranties, both as of this date and as of the date of Closing:

5A.1    USA Patriot Act.  Buyer is not, and will not be, a person or entity with whom Seller is restricted from doing business under the Uniting and Strengthening American by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (commonly known as the "USA Patriot Act") and Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001 and regulations promulgated pursuant thereto (collectively, "Anti Terrorism Laws"), including without limitation persons and entities named on the Office of Foreign Asset Control Specially Designated Nationals and Blocked Persons List.

5A.2    Authority.  The person executing this Agreement on behalf of Buyer is authorized to do so and at Closing, Buyer will be duly authorized to consummate the transaction contemplated by this Agreement.

5A.3    On-Site Employees.  No later than thirty (30 days prior to Closing, Buyer's management company shall interview the Property's on-site management staff and shall inform Seller or Seller's current management company (as Seller directs) if any of the on-site management staff will not be offered positions with Buyer's management company.  Termination of any employees not offered by or accepting positions with Buyer's management company shall be the responsibility of Seller or its management company.

6.    POSSESSION. Possession of the Properties is to be given to Buyer, subject to the right of tenants under the Leases on the Closing Date, by delivery at Closing of the Deed, and all keys, combinations and security codes.

7.    BUYER'S REVIEW AND APPROVAL OF TITLE AND SURVEY.

7.1    Title Binder. Prior to or accompanying Seller's execution of this Agreement, Seller shall deliver to Buyer, Seller's title policy for the Property (complete with copies of all exceptions to title), and a current title commitment (the "Title Binder" or the "Title Commitment") from the Title Company to deliver to Buyer at Closing an ALTA Form Owner's Title Policy for the Facility with full extended coverage over all general exceptions (the "Title Policy"), describing the Property (which legal description shall be deemed incorporated into this Agreement), listing Buyer as the prospective named insured, and showing the Purchase Price and any permissible closing costs incurred by Buyer as the amount of insurance coverage. The Title Policy shall include such other endorsements as Buyer's lender may require, and as may be obtained under the laws of the State of New York. The costs of the Title Policy, and all endorsements to the Title Policy shall be paid by the Buyer. At such time as the Title Commitment is furnished to Buyer, Seller or the Title Company shall furnish a copy thereof to Buyer legible copies of all instruments referred to in the Title Commitment as conditions or exceptions to title to the Property (the "Exception Documents").

Seller promises and represents that it will pay and cause to be released, no later than the Closing, all liens against the Property except for the CCIDA documents. Seller may utilize the purchase price proceeds to cause the payment and release of such liens no later than the Closing, provided that such proceeds shall be sufficient to cure all title objections.

7.2    Survey. Prior to or accompanying Seller's execution of this Agreement, Seller shall deliver to Buyer any existing survey of Property in Seller's possession, and Buyer may order an updated ALTA survey (the "Survey"), prepared by a duly licensed land surveyor acceptable to Buyer.

7.3    Physical and Financial Inspection. Buyer, at its sole cost and expense, shall have the right, from time to time, upon notice to Seller and subject to the Leases, to enter upon the Property prior to the Closing Date hereunder for the purpose of conducting inspections, surveys and tests related to the Property. For a period (herein called the "Due Diligence Period" or the "Inspection Period") commencing on the date hereof, and expiring on August 30, 2006 (such date is herein referred to as the "Inspection Period Expiration Date"), Buyer shall have the right to perform a physical, legal, financial, economic and mechanical inspection, measurement, audit and environmental assessment of the Property and an inspection of all books and records and financial information, title search and survey review pertaining thereto, and Seller shall cooperate with Buyer and shall furnish to Buyer from the date hereof until Closing such information, materials and documents as Buyer may reasonably request and shall have its accountant available throughout such period to assist in Buyer's inspection and review. The inspection, audit and measurement of the Property's operation, condition and maintenance shall include, without limitation, such environmental and engineering inspections, reviews and assessments that Buyer deems appropriate. If a nationally recognized third party engineering, physical inspection firm or environmental firm shall find that greater than $50,000.00 in physical or environmental repairs are needed to the Property, not including up to $300,000.00 in cost for parking lot repairs and up to $100,000.00 in

HVAC repairs (net of any tenant obligation to repair same and net of Buyer's right to recover all or part of the costs thereof through common area maintenance charges), then Buyer (itself or through its attorney) shall have the right, at its sole option and discretion, to terminate this Agreement, by Notice (the "Termination Notice") given on the Inspection Period Expiration Date, however, the Initial Deposit shall be refunded to Buyer only upon written notice to Seller given on or before the Inspection Period Expiration Date of specific items of a physical or environmental nature requiring repairs in amounts beyond those referenced above. Upon such termination, the parties hereto shall have no further liabilities one to the other with respect to the subject matter of this Agreement except for the indemnity set forth in Section 7.4 below which shall survive termination of this Agreement. Notwithstanding the foregoing, Seller shall have a period of five (5) days from the date of the Termination Notice to give written notice to Buyer of its intent to cure and repair the Property as provided in the physical inspection report above prior to the Closing Date.

In connection with such inspection, and without limiting the generality of Seller's obligations hereunder, if in the possession of Seller and if available, Seller agrees to deliver to Buyer, within five (5) days:

7.3.1    Contracts, Licenses, Permits. Copies of the Contract Documents, the Licenses, all building permits, certificates of occupancy, certificates of insurance policies applicable to the Property and any other documents evidencing rights described in Section 1.2 hereof. The copies of the certificates of insurance heretofore delivered to Buyer's attorney are true and complete copies of all insurance maintained by Seller with respect to the Property. Seller has not received any notice from any insurance company of any work required to be performed by Seller at the Property.

7.3.2    Takings or Changes. Copies of all written notices to Seller of proposed or threatened takings or changes with respect to the Property or major access roads within a reasonable radius which would affect the access to the Property, or any portion thereof, by prospective occupants;

7.3.3    Tax Assessments, Appeals and Increases. Copies of all written notices to Seller of all filed, proposed or threatened tax assessment appeals or tax assessment increases related to the Properties;

7.3.4    Litigation. Copies of all pending and written notices to Seller of threatened litigation, including litigation involving tenants, affecting the Property or this transaction;

7.3.5    Title Information. Seller's title policy covering the Property and the Title Commitment.

7.3.6    Leases. True copies of all leases and brokerage agreements pertaining thereto as set forth on Exhibit "B".

7.4      Inspection Contingency. Buyer hereby agrees to defend, indemnify and hold Seller harmless from and against any and all costs, expenses, damages, liabilities and actions, including reasonable attorneys fees, which Seller may incur as a result of any act or omission

done or suffered by Buyer, or any agent, employee or contractor of the Buyer in connection with the inspection and testing contemplated pursuant to Paragraph 7.3.

8.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES. The representations of Buyer and Seller set forth herein in Article 5 shall survive the Closing and delivery of the deed for six (6) months.

9.    FIRE OR OTHER CASUALTY. Risk of loss, by reason of fire or other casualty shall remain with the Seller until the time of Closing and the following provision shall apply:

9.1    Maintain Insurance. Seller shall maintain in effect until the Closing Date the insurance policies (or like policies) now in effect with respect to the Property.

9.2    Minimal Damage. If prior to the Closing Date any portion of the Property is damaged or destroyed by fire or other casualty, and the cost of repair or restoration thereof shall be $50,000 or less (as established by two (2) good faith estimates obtained by Seller) (herein referred to as "Minimal Damage"), then this Agreement shall remain in force but Seller shall repair such damage or, if it cannot be completed prior to the Closing, allow Buyer a credit against the purchase price for the cost of such repair.

9.3    Substantial Damage. If prior to the Closing Date any portion of the Property is damaged or destroyed by fire or other casualty, and the damage is not "Minimal Damage" as defined in the preceding paragraph, Buyer may within ten (10) days after receipt of notice ("Damage Notice") of said damage or destruction, terminate this Agreement by giving written notice thereof to Seller ("Notice of Election"), and if this Agreement is so terminated, then the Deposit shall be immediately refunded to Buyer, and thereafter neither party shall have any further liability hereunder thereafter except for the indemnity set forth in Section 7.4 above. If Buyer does not terminate this Agreement, it shall remain in full force and effect, and the provisions of Section 9.4 below shall apply.

9.4    Closing After Substantial Damage. So long as this Agreement shall remain in force under Section 9.2 or 9.3, then (i) all proceeds of insurance collected prior to Closing, plus the amount of any deductible and coinsurance loss under Seller's insurance policy, shall be adjusted subject to Buyer's approval and participation in any adjustment, and shall be credited to Buyer against the Purchase Price payable by Buyer at Closing as stated in Section 9.2, and (ii) Buyer shall receive a credit against the Purchase Price for the balance, if any, of costs to repair the damage to the Property.

10.    CONDEMNATION. If, prior to the Closing Date, all or any portion of the Property becomes subject to any eminent domain proceedings or a notice of any eminent domain proceedings with respect to the Property or any part thereof is received by the Seller, so that such taking adversely affects the Property or its current economic viability, Buyer may terminate this Agreement, in which event the Deposit shall be immediately refunded to Buyer, and this Agreement shall be null and void. If this Agreement is not so terminated, Buyer shall be entitled to all awards or damages by reason of any exercise of the power of eminent domain or condemnation with respect to or for the taking of the Properties or any portion thereof. Any negotiation for, or agreement to, and all contests of any offers

and awards relating to eminent domain proceedings shall be conducted with the joint approval and consent of the Seller and the Buyer. This right to terminate shall not be triggered by the anticipated agreements with NYDOT as referenced above.

11.    Expense Allocations.

11.1    Buyer shall pay for the title examination, premiums and endorsements and for any survey update requested by Buyer or its lender.

11.2    Seller shall pay all realty transfer taxes assessed against Seller and the entire broker's commission.

11.3    Buyer and Seller shall be responsible for paying their own attorney's fees in connection with this transaction and all costs and expenses associated with its financing, if any.

12.    CLOSING.

12.1    Time and Date and Place. The Closing on the sale of the Property (herein referred to as the "**Closing**") shall take place on or before October 23, 2006.

12.2    Documents. At Closing, the parties indicated shall simultaneously, as applicable, pay, execute, and deliver the following:

12.2.1 Seller's Documents and Other Items. Seller shall, when required, execute and, in all cases, deliver or cause to be executed and delivered to Buyer in proper form for recording:

12.2.1.1    Deed. A bargain and sale deed with covenants against the grantor's acts prepared by Seller's counsel (the "**Deed**") and affidavit of title, as required by the Title Company (the "**Affidavit of Title**"), conveying the Property to Buyer, duly executed by Seller for recording. The Deed description shall be based upon the metes and bounds description attached as Exhibit "A", unless Buyer requests that Seller convey the Property by the metes and bounds description shown on the new survey, if any, obtained by Buyer, in which event the Property shall be so conveyed and described in the Deed. In such instance, Buyer shall cause the new survey to be certified to Seller.

12.2.1.2    Bill of Sale. A warranty bill of sale prepared by Seller's counsel, assigning, conveying and transferring to Buyer, all of the Personal Property.

12.2.1.3    Original Licenses and Contract Documents . All original Licenses, Leases and Contract Documents described in Section 1.2 of this Agreement.

12.2.1.4    Assignment of Licenses and Contract Documents. An assignment agreement prepared by Seller's counsel, in the form attached hereto, assigning, conveying and transferring to Buyer the Licenses and Contract Documents.

12.2.1.5    FIRPTA Certificates. A certificate certifying that Seller is not a "foreign person" under Section 1445 of the Code.

12.2.1.6    <u>Title Insurance Certificates</u>.    Such affidavits of title or other certifications as shall be reasonably required by the Title Company and Buyer's lender to insure Buyer's title to the Properties as set forth in Section 3. If, for example, the title examination discloses judgments, bankruptcies or other returns against other persons having names the same as or similar to Seller, Seller shall deliver an affidavit showing that such judgments, bankruptcies and other returns are not against Seller.

12.2.1.7    <u>Seller Certificate</u>. A written bring down certification confirming that as of Closing no representation or warranty of Seller contained in this Agreement, including without limitation an updated rent roll, nor any document or certificate delivered to Buyer pursuant to this Agreement or in connection with the transaction contemplated hereby, contains any untrue statement of a material fact or knowingly omits to state a material fact necessary to make any representation or warranty contained herein misleading. In the event that any representation or warranty of Seller needs to be modified due to changes since the date hereof, Seller's certificate shall identify any representation or warranty which is not, or no longer is, true and correct and explaining the state of facts giving rise to the change.

12.2.1.8    <u>CCIDA</u>. Documentation evidencing the consent of CCIDA to Buyer's assumption of the existing CCIDA documents;

12.2.1.9    <u>Tenant Letter</u>.    Letters to each tenant advising of the change in ownership and directing the payment of rent to such party as the Buyer shall designate, said letter to be in form acceptable to Buyer;

12.2.1.10    <u>Tenant Estoppel Certificates</u>. Seller shall send requests for tenant estoppel certificates to each tenant at the Property stating that the lease and any amendments referenced therein are unamended and in full force and effect and providing for the dates in which the rent, including additional rent and other charges have been paid in advance, if any, and whether or not the landlord is in default in the performance of any covenant or agreements contained in the lease agreement or any broker's agreement pertaining to the Lease. The estoppel certificate shall be in the form specified in the various Leases and if no form is specified, then in the form of <u>Exhibit "G"</u> attached hereto and made a part hereof or shall be in the form required by Buyer's lender (provided that such lender's form shall be provided to Seller no later than August 31, 2006 and shall be acceptable to Seller). In the event Seller is unable to provide tenant estoppel certificates from Sears, JC Penney, Bass Pro Shops, Steve & Barry's (together, the "Anchor Tenants") and 75% of the in-line tenants (the "Inline Tenants") at the Property, Buyer shall have the right to extend the Closing Date until such tenant estoppels are provided, but no longer than 30 days from the Closing Date established herein. In the event any estoppel certificate indicates a default, the rent does not conform to the rent roll attached hereto, or otherwise does not reflect the representations made by Seller in Section 5.7, Buyer shall provide Seller notice of such discrepancy within a reasonable time following receipt thereof, and in the event Seller is unable to deliver a revised tenant estoppel or otherwise satisfy Buyer as to such differences or Seller has not delivered the estoppels required from the Anchor Tenants and Inline Tenants by Closing, Buyer may terminate this Agreement and receive a refund of the Deposit.

12.2.1.11    Organizational Documents. Confirmation of the existence and subsistence and good standing of Seller, and the authority of those executing for Seller, including, without limitation, a certificate from a member of the Seller confirming the incumbency of the signatories and the current force and effect of the resolution authorizing their execution of the documents required under this Agreement.

12.2.1.12    All keys, security codes and combination lock codes used at the Property; an assignment of all right, title and interest of Seller in and to the name "Fingerlakes Mall", and such other documents as Buyer reasonably may request to consummate the transactions contemplated herein.

12.2.1.13    An assignment and assumption of the Leases conveying the Seller's interest in the Leases to Buyer and wherein Buyer assumes the Leases in the form annexed as Exhibit "H".

12.2.1.14    Subordination Nondisturbance Agreement ("SNDA") from Bass Pro Shoppes, Sears, J.C. Penney and Steve & Barry's in the form regularly used by such tenants; review and negotiation thereof shall be the responsibility of Buyer's Lender, Buyer or Buyer's counsel.

12.2.1.15    Assignment of Existing Mortgage. Seller shall request that its current mortgagee execute and deliver at Closing an assignment to Buyer's lender of the existing recorded mortgage(s) on the Property in a form satisfactory to Buyer's lender. Buyer shall provide such form no later than October 15, 2006.

12.2.2 Buyer's Documents. Buyer shall deliver or cause to be delivered to Seller:

12.2.2.1    The amounts required to be paid to Seller pursuant to this Agreement;

12.2.2.2    An assignment and assumption of the Leases conveying the Seller's interest in the Leases to Buyer and wherein Buyer assumes the Leases in the form annexed as Exhibit "H".

12.2.3 Necessary Documents. Buyer and Seller shall execute and deliver such other documents and instruments as may be reasonably necessary to complete the transaction contemplated by this Agreement.

13.    DEFAULT; REMEDIES

13.1    In the event that any of Seller's material representations, warranties or covenants contained in this Agreement are untrue in any material respect or if Seller shall have failed to have performed any of the material covenants and/or material agreements contained in this Agreement which are to be performed by Seller, on or before the date set forth in this Agreement for the performance thereof, or if any of the conditions precedent to Buyer's obligation to consummate the transaction contemplated by this Agreement shall have failed to occur, Buyer's sole remedies shall be (i) to terminate this Agreement by giving written notice of such termination to Seller and Seller shall immediately thereafter cause the return of the Deposit, and thereupon, subject to the

provisions of Section 7.4 above and Section 13.3 below, the parties shall have no further liability to each other hereunder, (ii) to commence and diligently prosecute an action for specific performance by Seller of this Contract. In the alternative, Buyer may elect to close title without any reduction in Purchase Price. Definition of "material" for purposes of this paragraph: The delivery of each item required in this Agreement to be delivered by Seller shall be deemed material. Without intending to limit or otherwise exclude any accepted definition of "materiality," the Seller's failure to have performed any covenant and/or agreement contained in this Agreement shall be deemed "material" for purposes of this paragraph if Seller shall fail to undertake in writing to cure such failure within ten (10) days of the discovery of such failure or shall fail to cure such failure within such ten (10) days.

      13.2    Buyer recognizes that the Property will be removed by Seller from the market during the existence of this Agreement and that if this purchase and sale is not consummated because of Buyer's default Seller shall be entitled to compensation for such detriment. Seller and Buyer acknowledge that it is extremely difficult and impracticable to ascertain the extent of the detriment, and to avoid this problem, Seller and Buyer agree that if the purchase and sale contemplated in this Agreement is not consummated because of Buyer's default under this Agreement, and Seller is not in default hereunder, then Seller shall be entitled to retain the Deposit (including the Additional Deposit) as liquidated damages. The parties agree that the sum stated above as liquidated damages shall be in lieu of all other relief to which Seller might otherwise be entitled, Seller hereby specifically waiving any and all rights which it may have to damages or specific performance as a result of Buyer's default under this Agreement.

### 14.    CONDITIONS PRECEDENT TO CLOSING.

14.1    It shall be a condition to Buyer's obligation to close title that:

    (a) The representations and other statements of Seller set forth herein shall be true as of the Closing Date.

    (b) The covenants of Seller set forth herein shall have been complied with as of the Closing Date.

    (c) Seller shall convey to Buyer marketable and insurable title to the Property, in accordance with this Agreement.

    (d) Seller shall deliver possession of the Property to Buyer on the Closing Date in the condition required by this Agreement and in accordance with the terms, covenants and conditions of this Agreement.

    (e) Seller shall deliver the tenant estoppels and SNDAs as provided in Section 12 of this Agreement.

    (f) The CCIDA shall have approved the transfer of the Property by Seller to Buyer subject to the existing CCIDA documents.

14.2        Without limiting the other rights of Buyer, Seller shall permit Buyer and such agents and experts of Buyer as Buyer shall designate full access to the Property and all records concerning the Property during reasonable business hours, for purposes of such independent investigation as Buyer shall desire to conduct.

15.    PRORATIONS.

15.1    Operating Expenses. All operating expenses of the Property shall be prorated at Closing, including, for example, the following items, as of close of business of the day immediately preceding the Closing (the "**Adjustment Date**"):

15.1.1    Rents and Taxes. At the time of Closing and delivery of the Deed, collected rent and unapplied security deposits, if any, from the tenants, shall be adjusted between Seller and Buyer as of the Closing Date with charges and collected rent for the day of Closing allocated to the Buyer. The parties shall also adjust operating expenses, real estate taxes, vault charges (if any), water charges and sewer rents, if any, on the basis of the lien period for which assessed. To the extent that taxes and sewer charges for the current period are not available, then an adjustment shall be made on the basis of the last known prior charges with post-Closing adjustment when the new assessment, taxes and sewer charges are known. Any uncollected rents received by Buyer after Closing and collectable for the period prior to Closing, shall promptly be forwarded to Seller; provided that rent received by Buyer after Closing shall be deemed in payment of current rent (not more than one month in advance) that is owed to Buyer and any excess shall be deemed in payment of past due rent owned to Seller. The obligations of this paragraph with respect to any post-Closing adjustments shall survive Closing. If any of the Leases require any tenant to pay additional rent or charges (including without limitation percentage rent; escalations or other charges for taxes, labor or operating expenses; payments with respect to insurance; common area charges; and electricity, HVAC or other utility charges), and Seller shall have collected, or shall collect after the Closing Date, any portion of such additional rent or charges for a period beyond the Closing Date, then there shall be a pro rata adjustment and credit to Buyer for such period. If such additional rent or charges have not been billed or collected as of the Closing Date, any such additional rent or charges collected by Buyer shall be held for Seller, and Buyer promptly shall remit to Seller its pro-rata portion thereof.

15.1.2    Deposits. Tax and utility company deposits, if any.

15.1.3    Water and Sewer Charges.    Water and sewer charges and fire protection and inspection services based upon meter readings to be obtained by Seller effective as of the Adjustment Date, or if not so obtainable, a date not more than ten (10) days prior to the Adjustment Date, and the unfixed meter charges based thereon for the intervening period shall be apportioned on the basis of such last reading. Upon the taking of a subsequent actual reading, such apportionment shall be readjusted and Seller or Buyer, as the case may be, will promptly deliver to the other the amount determined to be so due upon such readjustment. If Seller is unable to furnish such prior reading, any reading subsequent to the Closing will be apportioned on a per diem basis from the date of such reading immediately prior thereto and Seller shall pay the proportionate charges due up to the date of Closing.

15.1.4 <u>Assigned Contracts</u>. Amounts paid or payable in respect of any service and maintenance contracts assigned to Buyer in accordance herewith.

15.1.5 <u>Electricity, gas, steam and fuel</u>. Electricity, gas and steam and fuel oil, if any, based on meter readings or a fuel company letter showing measurement on the day immediately preceding Closing, and valued at current prices.

15.2   <u>Custom and Practice</u>. Except as set forth in this Agreement, the customs of the State and County in which the Properties are located shall govern prorations.

15.3   <u>Future Installments of Taxes</u>. If at Closing, the Property or any part thereof shall be or shall have been affected by an assessment or assessments which are or may become payable in installments, then for purposes of this Agreement, all unpaid installments of any such assessment, including those which are to become due and payable and to be liens upon the Property shall be paid and discharged by Seller at Closing.

15.4   <u>Application of Prorations</u>. If such prorations result in a payment due Buyer, the cash payable at Closing shall be reduced by such sum. If such prorations result in a payment due Seller, the same shall be paid at Closing in the same manner as the Purchase Price.

15.5   <u>Schedule of Prorations</u>.   The parties shall endeavor to jointly prepare a schedule of prorations for the Property no less than five (5) business days prior to Closing.

15.6   <u>Readjustments</u>. The parties shall correct any errors in prorations as soon after the Closing as amounts are finally determined.

16.   <u>BROKERS</u>. Except for Holliday Fenoglio Fowler, L.P. ("HFF"), whose entire fee shall be paid by Seller pursuant to a separate written agreement, each party hereby represents and warrants to the other that it has not employed or retained any broker or finder in connection with the purchase and sale of the Property as contemplated by this Agreement, and that neither has had any dealings with any other person or party which may entitle that person or party to a fee or commission. Except for any and all fees due to HFF, which shall be paid entirely by Seller, each party shall indemnify the other of and from any claims for commissions by any person or party claiming such commission by or through the indemnifying party. The indemnification includes legal fees and all other costs incurred by the indemnified party in defending against any claim made. This paragraph shall survive Closing.

17.   <u>ESCROW AGENT</u>. The parties hereto have requested that the Deposit be held in escrow by the Escrow Agent to be applied at the Closing or prior thereto in accordance with this Agreement. The Escrow Agent will deliver the Deposit to Seller or to Buyer, as the case may be under the following conditions:

17.1   <u>Payment to Seller</u>. To Seller on the Closing Date upon the consummation of Closing;

17.2    Notice of Dispute. If either Seller or Buyer believes that it is entitled to the Deposit or any part thereof, it shall make written demand therefor upon the Escrow Agent together with the applicable provision(s) in the Agreement supporting the party's claim. The Escrow Agent shall promptly mail a copy thereof to the other party in the manner specified in Section 18.1 below. The other party shall have the right to object to the delivery of the Deposit, by filing written notice of such objections with the Escrow Agent at any time within ten (10) days after the mailing of such copy to it in the manner specified in Section 18.1 below, but not thereafter. Such notice shall set forth the basis for objection to the delivery of the Deposit. Upon receipt of such notice, the Escrow Agent shall promptly deliver a copy thereof to the party who filed the written demand. Notwithstanding the foregoing, except in the event of Buyer's breach of the indemnity contained in Section 7.4 of this Agreement, the Seller shall have no right to ever object to the Buyer's request for a return of the Deposit that is made on or before the Inspection Period Expiration Date and Escrow Agent shall immediately make such refund upon receipt of such request without waiting the foregoing 10 day period.

17.3    Escrow Subject to Dispute. In the event the Escrow Agent shall have received the notice of objection provided for in 17.2 above of this Section, in the manner and within the time therein prescribed, the Escrow Agent shall continue to hold the Deposit until (i) the Escrow Agent receives written notice from both Seller and Buyer directing the disbursement of the Deposit in which case the Escrow Agent shall then disburse said Deposit in accordance with said direction, or (ii) litigation arises between Seller and Buyer, in which event the Escrow Agent shall deposit the Deposit with the Clerk of the Court in which said litigation is pending, or (iii) the Escrow Agent takes such affirmative steps as the Escrow Agent may, at the Escrow Agent's option elect in order to terminate the Escrow Agent's duties including, but not limited to, deposit in Court and an action for interpleader.

17.4    Escrow Agent's Rights and Liabilities. Escrow Agent shall not be required to determine questions of fact or law, and may act upon any instrument or other writing believed by it in good faith to be genuine and to be signed and presented by the proper person, and shall not be liable in connection with the performance of any duties imposed upon Escrow Agent by the provisions of this Agreement, except for Escrow Agent's own willful default or gross negligence. Escrow Agent shall have no duties or responsibilities except those set forth herein. Escrow Agent shall not be bound by any modification of this Agreement, unless the same is in writing and signed by Buyer and Seller, and, if Escrow Agent's duties hereunder are affected, unless Escrow Agent shall have given prior written consent thereto. In the event that Escrow Agent shall be uncertain as to Escrow Agent's duties or rights hereunder, or shall receive instructions from Buyer or Seller which, in Escrow Agent's opinion, are in conflict with any of the provisions hereof, Escrow Agent shall be entitled to hold and apply the Deposit, pursuant to Section 17.3, and may decline to take any other action.

18.    GENERAL PROVISIONS.

18.1    Notices. All notices or other communications required or permitted to be given under the terms of this Agreement shall be in writing, and shall be deemed effective when sent by (i) nationally-recognized overnight courier, (ii) facsimile and e-mail, or (iii) deposited in the United States mail and sent by certified mail, postage prepaid, addressed as follows:

18.1.1  <u>If to Seller, addressed to</u>:

        Fingerlakes Mall, LLC
        124 Johnson Ferry Road NE
        Atlanta, GA 30328
        Attn: Jane Benefield
        <u>jbenefield@greggreenfield.com</u>
        Tel: (404) 236-2285
        Fax: (404) 236-2299

<u>with a copy in each instance to</u>:

        Gregory Greenfield & Associates, Ltd.
        124 Johnson Ferry Road NE
        Atlanta, GA 30328
        Attn: Linda K. Schear, General Counsel
        <u>lschear@greggreenfield.com</u>
        Tel: (404) 236-2305
        Fax: (404) 236-2299

18.1.2  <u>If to Buyer, addressed to</u>:

        Fingerlakes Mall Acquisition, LLC
        <u>c/o</u>:
        Vincent Nicoletta, Esq.
        Greenberg Nicoletta & Stein
        370 Lexington Avenue, Suite 703
        New York, New York 10017
        <u>vnicoletta@gnslawfirm.com</u>
        Tel: (212) 532-5533
        Fax: (212) 532-5501

18.1.3  <u>If to Escrow Agent, addressed to</u>:

        Lawyers Title Insurance Corporation
        c/o Boyle & Anderson, P.C.
        110 Genessee Street, Suite 300
        Auburn, NY 13021
        Attn:  Bob Bergan or Charlie Lynch
        <u>rkbergan@boylefirm.com</u> or <u>chlynch@boylefirm.com</u>
        Tel: (315) 253-0326
        Fax: (315) 253-4968

or to such other address or addresses and to the attention of such other person or persons as any of the parties may notify the other in accordance with the provisions of this Agreement.

      18.2   Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. Buyer shall have the right to assign this Agreement without the consent of Seller.

      18.3   Entire Agreement. All Exhibits attached to this Agreement are incorporated herein and made a part hereof. This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior negotiations, understandings and agreements of any nature whatsoever with respect to the subject matter hereof. This Agreement may not be modified or amended other than by an agreement in writing. The captions included in this Agreement are for convenience only and in no way define, describe or limit the scope or intent of the terms of this Agreement.

      18.4   Governing Law. This Agreement shall be construed and interpreted in accordance with the laws of the State of New York.

      18.5   Tender. Formal tender of Deed by Seller and of the Purchase Price by Buyer, are hereby mutually waived in the event of a prior default by the other or where it is clear that the either party does not intend to complete the Closing.

      18.6   Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

      18.7   Further Instruments. Seller will, whenever and as often as it shall be reasonably request so to do by Buyer, and Buyer will, whenever and as often as it shall be reasonably requested so to do by Seller, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all conveyances, assignments, correction instruments and all other instruments and documents as may be reasonably necessary in order to complete the transaction provided for in this Agreement and to carry out the intent and purposes of this Agreement. All such instruments and documents shall be satisfactory to the respective attorneys for Buyer and Seller. The provisions of this Article shall survive the Closing.

      18.8   Dates. In the event the last day permitted for the performance of any act required or permitted under this Agreement falls on a Saturday, Sunday, or legal holiday of the United States or the State of New York, the time for such performance will be extended to the date which is two business days thereafter. Time periods under this Agreement will exclude the first day and include the last day of such time period.

      18.9   Effective Date. Whenever the term or phrase "effective date hereof" or "date hereof" or other similar phrases describing the date this Agreement becomes binding on Seller and

Buyer are used in this Agreement, such terms or phrases shall mean and refer to the date set forth on the first page hereof.

18.10   Time for Acceptance.  This Agreement shall constitute an offer to buy or sell the Property, as case may be, on the terms herein set forth only when executed by the Seller or Buyer.

18.11   Facsimile.  A facsimile copy of this Agreement shall be deemed to be an original for all purposes.

18.12   Escrow Agent Execution.  The validity and enforceability of this Agreement and of any amendment hereto as between Buyer and Seller shall not be affected by whether or not the Escrow Agent shall have executed this Agreement or such Amendments.

18.13   Waiver of Jury Trial.  In any legal action (including arbitration and mediation) to enforce a party's rights and obligations under this Agreement, the prevailing party shall be entitled to an award of all reasonable legal fees and expenses, court costs, filing fees, and related costs incurred in regard to such action. **SELLER AND BUYER EACH HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.**

19.   OFAC.  The parties who are the Seller and Buyer each represent that: (i) each is not listed on the Special Designated National and Blocked Persons List maintained by the Office of Foreign Asset Control (the "OFAC") pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (the "Order"); (ii) each is not on any other list of terrorists or terrorist organizations maintained pursuant to the Order, the rules and regulations of OFAC, or any other applicable requirements contained in any enabling legislation or other Executive Orders in respect of the Order; and (iii) each has not been convicted, pleaded nolo contendere, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

**[Signatures on next page]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed the day and year first above written.

**Fingerlakes Mall, LLC**

By: _____

Gregory P. Greenfield
President

**Fingerlakes Mall Acquisition, LLC**

By: _____

Agreed to by Escrow Agent with regard
to the obligations, terms, covenants
and conditions contained in this
Agreement relating to Escrow Agent.

Lawyers Title Insurance Corporation

By: _____
Robert K. Bergen, Esq

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed the day and year first above written.

**Fingerlakes Mall, LLC**

By:_____

**Fingerlakes Mall Acquisition, LLC**

By:_____

Agreed to by Escrow Agent with regard to the obligations, terms, covenants and conditions contained in this Agreement relating to Escrow Agent.

Lawyers Title Insurance Corporation

By: _____
        Robert K. Bergen, Esq

## Exhibits to Agreement of Sale

"A"    -    Legal Description

"B"    -    Leases (rent roll, security deposit list and schedule of leases)

"B-1"  -    List of temporary tenants

"B-2"  -    Tenant defaults and delinquencies

"C"         Service Contracts

"D"    -    Litigation

"E"    -    Violations

"F"    -    Site plan showing drainage parcel, area of NYDOT Work and future "no access" area

"F-1"  -    Pending NYDOT Agreement

"G"    -    Tenant Estoppel Certificate

"H"         Assignment and Assumption of Leases